# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Patricia Kesselring,             :
               Petitioner    :
                                :
          v.               :
                                :
Workers' Compensation Appeal    :
Board (Pocono Medical Center and    :
Qual-Lynx),                     :    No. 1786 C.D. 2019
              Respondents    :    Submitted: October 23, 2020


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge[1]
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                            FILED: January 22, 2021


Patricia Kesselring (Claimant) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) November 27, 2019 order affirming the Workers' Compensation Judge's (WCJ) decision dismissing Claimant's Petition to Reinstate WC Benefits (Reinstatement Petition) and Petition to Review WC Benefits (Review Petition) (collectively, Petitions). Claimant presents four issues for this Court's review: (1) whether the Board erred by upholding the WCJ's determination that Claimant failed to meet her burden of proof; (2) whether the WCJ erred by finding the testimony of Barry A. Ruht, M.D. (Dr. Ruht) on reflex sympathetic dystrophy syndrome (RSD)[2] more credible than Randall W. Culp, M.D.'s (Dr. Culp) testimony; and (3) whether the WCJ erred by failing to

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Leavitt completed her term as President Judge.

[2] RSD is a sympathetic nerve problem. It is more recently referred to as complex regional pain syndrome.

render a credibility determination regarding John Petolillo, Jr., D.O.'s (Dr. Petolillo) testimony. Upon review, this Court affirms.

On January 7, 2015, Claimant sustained injuries when she fell while in the course and scope of her employment with Pocono Medical Center (Employer) as a cytotechnologist.[3] Employer issued a Notice of Compensation Payable, accepting liability for Claimant's injuries, therein described as right wrist and coccyx fractures and a contusion.[4] As a result of her work-related injury, Claimant was off work from January 7 to March 23, 2015, when she returned full-time without wage loss. However, after several days, her physician Frederick Barnes, M.D. (Dr. Barnes) limited her to working only six hours per day, and she received partial WC disability benefits. On April 1, 2015, Employer filed a Notification of Suspension or Modification of Benefits (Notification) modifying Claimant's benefits as of March 23, 2015. Claimant did not challenge the Notification.

On Friday, January 8, 2016, Claimant was involved in a verbal altercation at work regarding her vacation time. Although Claimant completed her shift that day, she did not return to work for her next shift on Monday, January 11, 2016, as scheduled. Instead, Employer received an office note from Internal Medicine Specialist Lan Su, M.D. (Dr. Su) excusing Claimant from work until January 18, 2016. *See* Reproduced Record (R.R.) at 243.[5] Thereafter, Dr. Barnes forwarded to Employer a January 14, 2016 office note, in which Dr. Barnes marked that Claimant was "[u]nable to return to work[.]" R.R. at 602.

---

[3] A cytotechnologist works in a hospital's pathology department, examining cells under a microscope and marking abnormal reactive cancer cells. They also push carts to fine needle biopsy procedures conducted in the hospital, remove the cells from the needles and prepare the biopsy slides for examination. *See* Reproduced Record at 102-105; WCJ Dec. at 3.

[4] Claimant is right-handed.

[5] Claimant did not place a small "a" after the page numbers in the Reproduced Record as Pennsylvania Rule of Appellate Procedure 2173 requires. *See* Pa.R.A.P. 2173. For ease of reference, the Court cites the Reproduced Record consistent with Claimant's numbering.

2

On February 18, 2016, Claimant filed the Reinstatement Petition claiming that she had to stop working and was again disabled due to her work injury as of January 11, 2016. Employer opposed the Reinstatement Petition, arguing that it has continued to make work available to Claimant within her restrictions, and that her out-of-work status was not related to her work injury but, rather, the January 8, 2016 altercation.

Based upon the results of Dr. Petolillo's March 17, 2016 independent medical examination (IME) of Claimant, on April 4, 2016, Employer sent letters to Claimant offering her her pre-injury job, either full-time or part-time, effective April 18, 2016. Although Claimant admitted she received the letters, she did not respond or return to work. After Dr. Barnes authorized Claimant to return to work in a sedentary position effective August 3, 2016, Employer offered Claimant a job as a greeter beginning October 24, 2016. Although Claimant admitted she received the letter, she did not respond to the job offer or return to work. Employer's job offers remain available to Claimant. On December 30, 2016, Dr. Culp performed surgery on Claimant's right wrist.

On May 22, 2017, Claimant filed the Review Petition seeking to expand her work injury description to include right hand complex regional pain syndrome (CRPS), which is the newer term for RSD. Employer denied the allegations in Claimant's Review Petition.

The WCJ conducted hearings on April 8 and July 29, 2016, and July 20 and September 15, 2017. Claimant testified and presented Dr. Culp's deposition testimony, and Employer presented, *inter alia*, the deposition testimony of its Laboratory Operations Manager Amy Yablonski (Yablonski), Pathology Department Supervisor Patti Reiser (Reiser), and Employee Health Nurse Practitioner Victoria Schieppe (Schieppe), as well as Dr. Ruht and Dr. Petolillo. On

3

August 15, 2018, the WCJ dismissed the Reinstatement Petition because Claimant failed to prove that the reason she left work in January 2016 was due to her work injury. The WCJ also dismissed the Review Petition because Claimant failed to prove that her RSD was related to her work injury. Claimant appealed to the Board, which affirmed the WCJ's decision on November 27, 2019. Claimant appealed to this Court.[6]

Claimant first argues that the Board erred by upholding the WCJ's dismissal of her Reinstatement Petition on the basis that Claimant failed to meet her burden of proving she left her modified job in January 2016 due to her work injury when the record established Claimant stopped working at Dr. Su's and Dr. Barnes' direction.

Initially, Section 413(a) of the WC Act (Act)[7] states, in pertinent part:

A [WCJ] . . . may, at any time, modify, reinstate, [or] suspend . . . a notice of compensation payable . . . upon petition filed by either party . . . , upon proof that the disability of an injured employe has increased, decreased, recurred, or has temporarily or finally ceased . . . . Such modification, reinstatement, [or] suspension . . . shall be made as of the date upon which it is shown that the disability of the injured employe has increased, decreased, recurred, or had temporarily or finally ceased[.]

77 P.S. § 772. "Under [the Act], the term 'disability' is synonymous with loss of earning power." *Donahay v. Workers' Comp. Appeal Bd. (Skills of Cent. PA, Inc.)*, 109 A.3d 787, 792 (Pa. Cmwlth. 2015). Therefore, "[i]f the reduction in earnings is

[6] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

[7] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

not tied to a loss of earning power attributable to the work injury, no disability benefits are due." *Id*. at 793. Accordingly,

> [a] claimant seeking reinstatement of suspended benefits must prove that: (1) h[er] earning power is once again adversely affected by the work-related injury; and, (2) the disability that gave rise to the original claim continues. *Bufford v. Workers' Comp. Appeal Bd. (N. Am*[.] *Telecom)*, . . . 2 A.3d 548 ([Pa.] 2010); *Teledyne McKay v. Workmen*['*s*] *Comp. Appeal Bd. (Osmolinski)*, 688 A.2d 259 (Pa. Cmwlth. 1997). Once the claimant meets this burden, the burden shifts to the party opposing reinstatement to show that the claimant's loss in earnings is not caused by the disability arising from the work injury. *Bufford*.
>
> [Generally, u]nder a suspension of benefits, . . . an employer remains responsible for the consequences of a work injury. *Magulick v. Workers' Comp. Appeal Bd. (Bethlehem Steel* [*Corp.*]*)*, 704 A.2d 176 (Pa. Cmwlth. 1997). This is because the injury is presumed to continue, yet a claimant suffers no related loss of income. *Id*.

*Dougherty v. Workers' Comp. Appeal Bd. (QVC, Inc.)*, 102 A.3d 591, 595 (Pa. Cmwlth. 2014).

"In the case of an employee who has accepted and performed [a] light-duty job, the focus of the inquiry is on the employee's reason for losing the job, *i.e.*, whether the loss of earnings was through []no fault of his own.[]" *Johnson v. Workmen's Comp. Appeal Bd. (McCarter Transit, Inc.)*, 650 A.2d 1178, 1181 (Pa. Cmwlth. 1994) (quoting *Bennett v. Workmen's Comp. Appeal Bd. (Hartz Mountain Corp.)*, 632 A.2d 596, 598 (Pa. Cmwlth. 1993)).

Here, Claimant testified that her job with Employer required her to move slides around and to adjust a microscope, which involved "constant repetitive motion of both hands[.]" R.R. at 103. Claimant recounted that she experienced such pain in her right hand after she returned to work in March 2016 and that Dr. Barnes

5

reduced her work hours from eight hours to six hours per day. *See* R.R. at 102. She claimed that she continued to experience right wrist pain and had increasing difficulty turning the microscope knobs, but admitted that she never informed her supervisor or manager that she was having difficulty doing her job. *See* R.R. at 118, 172, 174.

Claimant disclosed that she was born with Ehlers-Danlos Syndrome, a connective tissue disease that has resulted in her undergoing 11 knee surgeries, and has deteriorated muscles that cause her to fall easily. She also suffers from osteoporosis that causes her bones to break. Claimant further disclosed that she fell in the sand while on vacation in June 2015, reinjuring her right wrist, and resulting in her wearing a cast for six weeks. Claimant learned from a radiologist after the June 2015 fall that her "old fractures" had not healed properly, which was why she still experienced pain. R.R. at 122. Claimant nevertheless continued working in her modified capacity after her June 2015 fall.

Claimant asserted that she cannot do a sedentary job because she cannot sit for long periods due to her tailbone injury, she cannot stand for long periods because of her knees, her right hand does not work, and she cannot lift anything. *See* R.R. at 125. She claimed that her ongoing wrist pain and inability to sleep prevents her from accepting Employer's job offers. *See* R.R. at 131. Claimant added that James B. Kim, D.O. (Dr. Kim) has opined that her right wrist needs to be re-broken and pins and plates inserted; however, he is concerned that, due to her Ehlers-Danlos Syndrome and osteoporosis,[8] the surgery could place her in a worse condition.

Claimant confirmed that her last day at work was Friday, January 8, 2016. She described that there had been a meeting about vacation time that day,

---

[8] Dr. Barnes referred Claimant to Dr. Kim in January 2016. At that point, one year after her January 2015 work accident, Dr. Kim observed that Claimant's right wrist had not yet healed. *See* R.R. at 117-118, 129.

6

during which she became upset because it was the second time she had been verbally attacked at work.[9] Claimant recollected that she finished her shift, but did not return to work thereafter. She testified that she treated with Dr. Su on Monday, January 11, 2016 for chest pain, and Dr. Su issued an office note taking her out of work until January 18, 2016. *See* R.R. at 114.

> Claimant expounded:
>
> Q. When Dr. [] Su took you out of work in January [2016], you said it was because you were having chest pain?
>
> A. I was having chest pain, anxiety. I cried all the time. I was not sleeping at all.
>
> Q. Did the chest pain resolve?
>
> A. Since I've been home, that resolved.
>
> Q. And when Dr. [] Su took you out of work, that was for --- just for a limited period of time[,] correct?
>
> A. Yes.
>
> . . . .
>
> Q. Did Dr. [] Su put a time frame on how long to remain out of work?
>
> A. No. I was having panic attacks. I think she might've said [] out of work for just this week. I was in a bad emotional state. . . .

R.R. at 135-136. Claimant further recalled that, on January 14, 2016, Dr. Barnes gave her a work-status form representing that she was "[u]nable to return to work; [and] will be evaluated at next appointment [on February 23, 2016]," R.R. at 602,

---

[9] Claimant contended that, in December 2015, Reiser asked her in front of the entire department how much longer other people were going to have to perform her work for her. *See* R.R. at 134. Claimant did not lodge a complaint with Human Resources about that incident until after the January 8, 2016 dispute. *See* R.R. at 134, 170.

7

which form Claimant forwarded to Schieppe.  Claimant declared that she has not worked since January 8, 2016.

Reiser was Claimant's immediate supervisor.  She confirmed that Claimant returned to work on March 23, 2015, with lifting, pushing, and pulling restrictions, so Reiser eliminated from Claimant's duties breast biopsies and fine needle aspirations that required Claimant to push a cart.  She further stated that Claimant's doctor reduced Claimant to working only six hours per day as of April 1, 2015.  Reiser testified that Claimant never mentioned having difficulty doing her modified job, Claimant did not request any accommodations, and Reiser did not have any complaints about Claimant's job performance.  *See* R.R. at 528, 534-535, 543, 552, 561-562.

Reiser stated, relative to the January 8, 2016 altercation, that Nicole Dwyer (Dwyer) had submitted her March 14 to 18, 2016 (pre-booked cruise) vacation request to Reiser in December 2015, and Reiser posted it on the master calendar in January 2016.  Reiser recounted that, after seeing the master calendar, Claimant complained to her that Dwyer cannot take off work that week because, due to Claimant's husband's schedule, that was the only week Claimant could take vacation.[10]  Reiser learned that the pathologists agreed to take on extra responsibilities so both Claimant and Dwyer could take vacation the same week.

Reiser explained that she and Yablonski called a meeting with Claimant, Dwyer and the third cytotechnologist, Rachel DeSanto, on January 8, 2016, to discuss the matter in an effort to avoid a similar future occurrence.  Reiser described that, after Claimant and Dwyer were told both vacations would be accommodated, Claimant "got very upset," claiming that Dwyer's vacation request should have been denied because Claimant had more seniority.  R.R. at 539.  She

---

[10] Notably, Claimant had not submitted a vacation request to Reiser.

8

expounded that Claimant "became out of control[,]" yelling derogatory remarks at Dwyer. R.R. at 541.

> Reiser detailed:
>
> > [Dwyer] was crying in the corner. [Claimant] was still yelling at her, coming at her, pointing her finger about how she should not have been entitled. So [Yablonski] and I looked at each other, and [Yablonski] stopped the meeting and said, we need to continue this when everyone kind of regains some self-control, and we ended it. Everyone left.
> >
> > In fact, let me just add [Dwyer] offered to not take her vacation just basically to keep the peace of the department and said, [Claimant], you can have it. . . . [Claimant] just went on and on all about why [Dwyer] shouldn't have had this vacation.

R.R. at 542. Reiser stated that Claimant completed her shift after the meeting.

Reiser testified that, on Monday, January 11, 2016, Claimant called and notified the department secretary that she had experienced chest pains all weekend and was scheduled to take a stress test and, thereafter, faxed to Employer Dr. Su's office note excusing Claimant from work until Monday, January 18, 2016.[11] Reiser further recalled that Claimant submitted a January 15, 2016 office note from Dr. Barnes excusing Claimant from work indefinitely, and also left a message for Reiser on Sunday, January 17, 2016, "say[ing] that she would be out, with no additional details, no return date, no excuse, no nothing." R.R. at 550.

Yablonski managed Claimant's department. She testified that, although she did not directly supervise Claimant on a day-to-day basis, she was aware of Claimant's work injury, and that Claimant worked reduced hours after

---

[11] In the meantime, Claimant contacted the department pathologist about taking her previously scheduled annual certification test on Wednesday, January 13, 2016. Reiser and Yablonski called Claimant and left a message that hospital policy prohibited her from returning for the test in light of Dr. Su's office note, but that she could take the test up until March 2016 if she produced a doctor's note allowing her to return to work to do so.

March 23, 2015, as a result. Yablonski stated that neither Claimant nor Reiser informed her that Claimant was having difficulty performing her job duties because of her work injury. *See* R.R. at 614-615.

Yablonski described that, because of the conflict between Claimant and Dwyer regarding their scheduled vacations, Yablonski called the January 8, 2016 meeting, notified Claimant and Dwyer that they could take their vacations because the pathologists would help cover the department in their absences and, in the future, there would be a better vacation scheduling process. Yablonski recalled Claimant nevertheless arguing that Dwyer's vacation should be denied, Claimant "putting her finger in [Dwyer's] face[,]" and "[Dwyer] crying because she was being told that she was inappropriate and she was disrespectful because she put in this vacation request. The discussion got very heated." R.R. at 619. Yablonski ended the meeting to allow everyone to cool off and discuss the matter on the next work day, Monday, January 11, 2016. Yablonski explained that the follow-up meeting did not take place because Claimant did not return to work.

Schieppe oversees Employer's WC claims. She recalled that Claimant was off work because of her injury from January 7 to March 23, 2015, and worked modified hours thereafter through January 8, 2016. Schieppe declared that Claimant never expressed any difficulty in performing her modified job during that time. *See* R.R. at 638.

The law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000).

10

Here, the WCJ found "that [] Claimant was evasive in her testimony. Based upon that[,] and her bearing and demeanor, the testimony of [] Claimant is found to be less than credible. The testimony of [] Claimant with respect to the reasons that she left work[] in January of 2016 [are] rejected." WCJ Dec. at 14, Finding of Fact (FOF) 15 (R.R. at 38). The WCJ also found Yablonski's and Reiser's testimony about the reasons Claimant left work in January 2016 credible, "f[inding] as fact that [] Claimant left work after having a confrontation over her vacation time and that she subsequently sent [] Employer a[n office] note from Dr. Su saying that she was being taken out of work because of stress and chest pains." WCJ Dec. at 14, FOF 16 (R.R. at 38). The WCJ reiterated: "Based upon the evidence in totality, [the WCJ does] not believe that [] Claimant [] prove[d] that she left work in January of 2016 because of her work[]injury. [] Claimant's testimony in th[at] regard [i]s not credible." WCJ Dec. at 16, FOF 23 (R.R. at 40). "Accordingly, [the WCJ] found as fact that the Claimant left work in January of 2016 due to the altercation that she had over vacation time and not due to her physical condition." *Id.*

Neither the Board nor the Court may reweigh the evidence or the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246 (Pa. 2001). Specifically, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. [Thus, u]nless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal."[12] *Pa. Uninsured Emps. Guar. Fund v. Workers' Comp. Appeal Bd. (Lyle)*, 91 A.3d 297, 303 (Pa. Cmwlth. 2014) (quoting

---

[12] Capricious disregard "occurs only when the fact-finder deliberately ignores relevant, competent evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 145 (Pa. Cmwlth. 2004). Capricious disregard, by definition, does not exist where, as here, the WCJ expressly considered and rejected the evidence. *Williams*.

11

*Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006)).

Furthermore, this Court has held:

'In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party who prevailed before the factfinder.' 'Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party.' It does not matter if there is evidence in the record supporting findings contrary to those made by the WCJ; the pertinent inquiry is whether the evidence supports the WCJ's findings.

*3D Trucking Co., Inc. v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007) (citations omitted) (quoting *Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164, 168 (Pa. Cmwlth. 2003)).

Here, the WCJ found Claimant's evidence that her earning power was once again adversely affected by her work injury as of January 11, 2016, not to be credible, *see Univ. of Pa.*, substantial evidence supported the WCJ's finding, *see 3D Trucking Co., Inc.*, and there is no other credible evidence supporting Claimant's position. Accordingly, Claimant did not meet her burden of proving ongoing disability as of January 11, 2016, and the Board properly upheld the WCJ's decision on this issue.

Claimant also contends that the WCJ erred by finding Dr. Ruht's causation testimony relative to RSD more credible than Dr. Culp's testimony. Dr. Ruht testified that he conducted Claimant's IME on October 6, 2017. Dr. Ruht explained that he took Claimant's history, reviewed her medical records, including x-rays, studies and images, and examined Claimant. *See* R.R. at 825-850.

12

Dr. Ruht was aware that Dr. Barnes questioned whether Claimant had RSD or CRPS as early as April 1, 2015, and ordered a three-phase bone scan. *See* R.R. at 791. Dr. Ruht described that a three-phase bone scan is the test most commonly used to diagnose RSD; however, "[i]n this case, there were no positive findings on [Claimant's April 6, 2015] bone scan to suggest RSD[.]" R.R. at 748. Dr. Ruht also reviewed Claimant's July 2, 2015 and October 20, 2015 right wrist magnetic resonance images, which did not show evidence of RSD. *See* R.R. at 749. In addition, he examined Claimant's March 30, 2015 and October 3, 2016 electromyography (EMG) nerve conduction studies, and saw no evidence of RSD. *See* R.R. at 750. Dr. Ruht further testified that, based on his review of Dr. Kim's records, Dr. Kim did not see typical physical evidence of RSD in Claimant, "such as discoloration, hot or cold skin, abnormal fingernail pattern, or abnormal hair growth pattern." R.R. at 762.

Dr. Ruht also found that there was no reference to RSD in Claimant's occupational therapy notes from February to August 2015 but, rather, notations that Claimant's swelling reduced, and she showed steady improvement and tolerated treatments well, which Dr. Ruht claimed "does not happen with RSD." R.R. at 767. Instead, Dr. Ruht offered that someone suffering from RSD would have diminished motion, increased pain and more swelling over time. *See* R.R. at 769-770.

Dr. Ruht added that he reviewed Dr. Culp's records and deposition testimony. Dr. Ruht recalled that Dr. Culp's October 3, 2016 report reflected that Claimant had a possible right CRPS, but Dr. Culp admitted he was not certain he understood all of Claimant's symptoms given the large discrepancy between her active and passive wrist range of motion. Dr. Ruht stated: "[I]f [Dr. Culp] had a real concern about RSD, that's an absolute contraindication to doing surgery, but surgery

13

was performed on December 30, 2016[,] with no documentation of RSD in th[e] operative note." R.R. at 763; *see also* R.R. at 765.

Dr. Ruht expressed that, although Claimant reported pain (at a level 8 out of 10) with accompanying stinging and burning with resultant sleep disturbance,[13] Dr. Ruht found the discrepancies in his examination of Claimant led him to believe that Claimant was magnifying her symptoms. *See* R.R. at 764-765, 771-772. He specifically recalled:

> [Claimant's] right upper extremity ha[d] altered sensation along all dermatomal and peripheral nerve distributions from wrists to fingertips. I thought that was extraordinary and part of my mentioning the symptom magnification.
>
> This was not present in anybody else's evaluations and certainly not supported by the two EMGs. She states that sensation to light touch or palpation is diminished on the right[-]upper[-]extremity wrist to fingertips compared to the left[-]upper[-]extremity wrist to fingertips she states she does feel.
>
> And these are all things we look for in terms of signs or clinical findings for RSD, and they were not present.

R.R. at 774.

Dr. Ruht acknowledged that a wrist fracture is one of the most common injuries to cause RSD/CRPS. *See* R.R. at 789. He expounded:

> [T]he two pain components of RSD are CRPS or allodynia and hyperalgesia. Allodynia is when you go to touch the patient's extremity and they withdraw as if you had done something very painful and you hadn't even touched them.
>
> Hyperalgesia is [when] you [] touch the extremity [with a] light touch or deeper, and they would withdraw violently,

---

[13] Dr. Ruht stated that Claimant did not mention her Ehlers-Danlos Syndrome or osteoporosis to him. *See* R.R. at 773, 794-795.

14

and that was not the case on my examination or anybody else's.

R.R. at 774-775.

Dr. Ruht added that Claimant did not exhibit any motor changes (i.e., tremors), or changes in her hair, skin, nails, temperature or color that normally accompany RSD, which was consistent with Claimant's other doctor's findings. *See* R.R. at 775. Dr. Ruht found that Claimant lacked right wrist dorsiflexion (i.e., upward motion), radial and ulnar deviations (i.e., moving her wrist to her thumb and opposite sides of her forearm), and her palm reflection (i.e., downward motion) was only 45 degrees, which were not evident on any of Claimant's prior examinations.[14] *See* R.R. at 776. Dr. Ruht opined that he did not see any objective basis during his examination, or in Claimant's studies, for Claimant's limited ability to flex her right wrist in either direction. *See* R.R. at 776-778. Dr. Ruht described that Claimant's upper extremities were identical, with no swelling or atrophy on the right. *See* R.R. at 776, 778-779. Dr. Ruht declared that "wasting or atrophy of the injured side . . . would have been present with RSD, and it was not." R.R. at 779. In his IME report, Dr. Ruht stated: "[C]laimant's return to work from March 2015 to January 2017 [sic] [] would have been impossible with either evolving RSD/CRPS or the presence of RSD/CRPS." R.R. at 842.

Based upon his review of Claimant's history and medical records, and his examination of Claimant, Dr. Ruht declared, within a reasonable degree of medical certainty, that Claimant had completely recovered from her work-related right wrist fracture at the time of her October 6, 2017 IME, she did not have RSD or

---

[14] Dr. Ruht added that anyone with Claimant's symptoms would have difficulty driving a car and, in fact, it is illegal to drive in Pennsylvania with an impaired upper extremity. *See* R.R. at 777-778. He did not see that any of Claimant's treating physicians have restricted her ability to drive, *see* R.R. at 777-778, and Claimant admitted she still drives. *See* R.R. at 125-127.

15

CRPS of her right upper extremity,[15] and she could return to work without further right wrist treatments or restrictions. *See* R.R. at 781-783, 787.

Dr. Culp testified that Dr. Barnes referred Claimant to him, and he first examined her on October 3, 2016, at which time Claimant complained of numbness and tingling in her right thumb, right wrist pain and decreased fine motor skills on the right. *See* R.R. at 273. He observed relative to Claimant's right hand that she had full passive range of motion, limited active range of motion, low grip strength, a mottled appearance, and decreased temperature. *See* R.R. at 275, 277, 317. Dr. Culp explained that the appearance and temperature are significant when diagnosing RSD. *See* R.R. at 277. Dr. Culp's initial diagnosis was status post-right distal radius fracture and possible CRPS, and he scheduled Claimant for an EMG. *See* R.R. at 279.

Dr. Culp expressed his surprise that Claimant allowed him to do passive range of motion testing because patients with RSD do not tolerate that movement; however, he claims that he later reached his RSD diagnosis based on his clinical findings of shiny skin on her fingers and a nerve block, after which her hand color changed and temperature warmed. *See* R.R. at 281, 317, 321-327. Dr. Culp acknowledged, relative to Claimant's April 6, 2015 bone scan, that "there was no evidence of RSD on that study[,]" but claimed that a bone scan does not always reflect RSD. R.R. at 273; *see also* R.R. at 297. He also declared that neither Claimant's carpal tunnel syndrome that he diagnosed and surgically released, nor her Ehlers-Danlos Syndrome would have accounted for those symptoms. *See* R.R. at 331-333, 357. Further, he could not rule out that Claimant's June 2015 wrist

---

[15] Dr. Ruht's assessment was based on the Budapest criteria, which he claimed is the gold standard in the industry for diagnosing RSD or CRPS. *See* R.R. at 782-783.

injury caused her CRPS, and considered that both may have been involved. *See* R.R. at 339.

Dr. Culp performed carpal tunnel release surgery on Claimant on December 30, 2016, which improved her right forearm symptoms and eliminated her night pain, but she still experienced numbness and tingling and limited range of motion on the right. *See* R.R. at 296, 353. Because he did not feel that there were any other surgeries that would help her when he last saw her on February 23, 2017, Dr. Culp referred Claimant for pain management. *See* R.R. at 296.

Notably, Dr. Culp did not review any of Claimant's medical records or the other doctors' depositions and, rather than review Claimant's test results, he looked only at the accompanying reports. *See* R.R. at 302-307, 339, 343-345. During the time Dr. Culp treated Claimant, he did not think she was capable of working. *See* R.R. at 299-300. However, he admitted that he was not aware of her work capabilities after February 23, 2017. *See* R.R. at 341.

Based upon the evidence, the WCJ made the following relevant factual finding:

> [Dr. Culp] was candid enough to admit that he had reviewed none of Dr. Barnes['] records and relied on Claimant's account of her history in reaching his opinions concerning the diagnosis of Claimant's work-injury. Dr. Culp stated that he believe[d] that [] Claimant's carpal tunnel syndrome and RSD were caused more by the first injury than by the second. He base[d] this opinion on the fact that the first fall was forceful enough to fracture [] Claimant's skull and coccyx. However, there has been no clear evidence in this case other than Claimant's testimony that her skull or coccyx were ever fractured. Dr. Culp is candid enough to admit that he has never seen any medical evidence that [] Claimant did suffer a skull fracture. Because Dr. Culp based his opinion of causation on the history given to him by [] Claimant and not on the records

17

of Claimant's treating physician[] Dr. Barnes, **Dr. Culp's opinion [] as to causation [is] rejected**.[16]

WCJ Dec. at 15, FOF 19 (R.R. at 39) (emphasis added).

The WCJ further found:

As has been noted, [Employer] presented the deposition testimony of Dr. [] Ruht. Dr. Ruht testified that he extensively reviewed the records of Dr. Barnes. According to Dr. Ruht, the January 7, 2015 x-ray showed a fracture of the distal right radius and the ulnar styloid process. The doctor testified that Dr. Barnes['] records show a steady healing of Claimant's fracture and that Dr. Barnes pronounced the fracture healed in February of 2015. The doctor testified that the second fracture in June of 2015 was a fracture of the radius bone with no fracture of the ulnar bone. This [is] inconsistent with the testimony of the other physicians in this matter. Because Dr. Ruht extensively reviewed the medical records of Dr. Barnes and commented on them, he is found to be credible with respect to the Claimant's history. To the extent that he differs with [the] diagnosis of Dr. Culp, Dr. Ruht's testimony is rejected. However, **Dr. Ruht is found to be more credible than the other physicians when describing Claimant's history and the causation of her complaints**.

WCJ Dec. at 16, FOF 21 (R.R. at 40) (emphasis added).

The WCJ continued:

Dr. Culp testified that the work[]injury necessitated the surgery . . . . However, Dr. Culp's testimony in this regard is rejected because he candidly admits that he did not review the records of Dr. Barnes and that he has no conception of Claimant's history other than the history that [] Claimant gave him which has been shown to be inaccurate. Accordingly, it is found as fact that []

---

[16] The WCJ stated: "Admittedly[,] this is a very difficult case with confusing and conflicting medical testimony. While it is not unusual for medical testimony to be in conflict with respect to diagnoses and causation, this case is unique because the testimony concerning [] Claimant's medical history is confusing and contradictory." WCJ Dec. at 16, FOF 22 (R.R. at 40).

18

> Claimant's RSD and carpal tunnel syndrome are not related to her initial work[ ]injury.

WCJ Dec. at 16, FOF 24 (R.R. at 40). Based upon those findings, the WCJ concluded that Claimant "failed to prove by sufficient, competent, and credible evidence that her RSD and carpal tunnel syndrome were caused by her January 7, 2015 work injury." WCJ Dec. at 17, Conclusion of Law 3 (R.R. at 41).

Because it was within the WCJ's exclusive province to determine credibility, *see Univ. of Pa.*, and substantial evidence supported the WCJ's findings, *see 3D Trucking Co., Inc.*, the WCJ did not err by accepting Dr. Ruht's testimony over Dr. Culp's testimony. Accordingly, the Board properly upheld the WCJ's decision dismissing Claimant's Review Petition.

Finally, Claimant asserts that the WCJ erred by failing to render a credibility determination regarding Dr. Petolillo's testimony which contradicted Dr. Ruht's testimony. Specifically, Dr. Petolillo concluded in March 2016 that Claimant had not fully recovered from her work injuries but, in October 2017, Dr. Ruht declared that she had recovered from her work injuries.

Dr. Petolillo testified on Employer's behalf in opposition to Claimant's Reinstatement Petition. Dr. Petolillo performed Claimant's March 17, 2016 IME. *See* R.R. at 515-519. As part of the IME, Dr. Petolillo reviewed Claimant's medical records and tests (which showed progressive healing of her right wrist), took her medical history (including her Ehlers-Danlos Syndrome, osteoporosis and June 2015 fall), and physically examined her. *See* R.R. at 476-480. He recalled, based on his examination, that Claimant complained of a sore tailbone, right-wrist pain and dropping things. *See* R.R. at 476. He explained that Claimant exhibited diffuse tenderness in her right wrist on palpation, a positive Tinel's test with complaints of numbness and tingling in her forearm that did not radiate into her hand, a negative Phalen's sign for carpal tunnel, and only some decreased range of motion. *See* R.R.

19

at 480-481, 484, 518.  Dr. Petolillo declared that Claimant did not show signs of right hand atrophy, which would be evident in someone with extensive median nerve involvement.  *See* R.R. at 480-481.  Dr. Petolillo stated that Claimant informed him about having her work hours reduced from eight hours to six hours per day because eight hours was problematic for her, but Claimant did not tell him that working six hours per day was problematic for her.  *See* R.R. at 498.

Dr. Petolillo opined within a reasonable degree of medical certainty that, although he did not believe Claimant had fully recovered from her right hand injury, she had reached maximum medical improvement, she did not need additional medical treatment, and she was able to return to work as a cytotechnologist without any special restrictions.  *See* R.R. at 482-484, 493, 518.  Dr. Petolillo specified that he saw nothing in Claimant's records objectively showing that her condition had worsened in any way from March 2015 to January 2016 to cause her to be taken out of work in January 2016.  *See* R.R. at 483, 497.

This Court has explained:

Section 422(a) of the Act[, 77 P.S. § 834,] aids meaningful appellate review by requiring the WCJ to issue a reasoned decision containing findings of fact and conclusions of law based upon the record as a whole and clearly stating the rationale for the decision.  When the WCJ is faced with conflicting evidence, [S]ection 422(a) of the Act requires the WCJ to state the reasons for rejecting or discrediting competent evidence.

*Reed v. Workers' Comp. Appeal Bd. (Allied Signal, Inc.)*, 114 A.3d 464, 470 (Pa. Cmwlth. 2015) (citation omitted).  To satisfy the reasoned decision requirement, "[t]he WCJ need not address all of the evidence, but he must 'make findings necessary to resolve the issues raised by the evidence and relevant to the decision.'" *Fedchem, LLC v. Workers' Comp. Appeal Bd. (Wescoe)*, 221 A.3d 348, 357 (Pa.

20

Cmwlth. 2019) (quoting *Green v. Workers' Comp. Appeal Bd. (US Airways)*, 155 A.3d 140, 148 (Pa. Cmwlth. 2017)).

This Court acknowledges that the WCJ did not make a specific credibility determination about Dr. Petolillo's testimony. However, the WCJ only has to resolve potentially conflicting evidence and render credibility determinations regarding issues relevant to the decision made. *Fedchem, LLC*. Here, the WCJ found "Dr. Ruht . . . to be more credible than the other physicians when describing Claimant's history and the causation of her complaints." WCJ Dec. at 16, FOF 21 (R.R. at 40). Moreover, Dr. Petolillo's testimony was offered in response to Claimant's Reinstatement Petition, where the focus was on whether Claimant's loss of earnings was due to her work injury. Whether or not Dr. Ruht and Dr. Petolillo agreed that Claimant had fully recovered, or only reached maximum medical improvement when they examined her, was immaterial. As to whether Claimant's work injury once again affected her earning power in January 2016, Drs. Ruht and Petolillo agreed. They both opined within a reasonable degree of medical certainty that Claimant could perform her time-of-injury job without restrictions and, thus, without lost earnings, thereby supporting the WCJ's conclusion that the reason Claimant left work in January 2016 was not related to her January 2015 work injury. Accordingly, given that their testimony in that regard did not conflict, and "[b]ecause the WCJ was not required to address all of the evidence presented, Claimant's argument [that the WCJ failed to render a specific credibility determination regarding Dr. Petolillo's testimony] necessarily fails." *Green*, 155 A.3d at 148.

For all of the above reasons, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

21

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Patricia Kesselring, :
                    Petitioner :
                           :
            v. :
                           :
Workers' Compensation Appeal :
Board (Pocono Medical Center and :
Qual-Lynx), : No. 1786 C.D. 2019
                Respondents :

## O R D E R

AND NOW, this 22nd day of January, 2021, the Workers' Compensation Appeal Board's November 27, 2019 order is affirmed.

_____
ANNE E. COVEY, Judge